IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PATSY J. SHOUP,

:
   Plaintiff,
          Case No. 3:12-cv-351

 v.       :

BRIAN M. DOYLE,
           JUDGE WALTER H. RICE
   Defendant.
       :

---

DECISION AND ENTRY SUSTAINING DEFENDANT BRIAN M.
DOYLE'S MOTION FOR SUMMARY JUDGMENT (DOC. #27);
JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST
PLAINTIFF; TERMINATION ENTRY

---

Plaintiff Patsy J. Shoup ("Shoup" or "Plaintiff") filed suit alleging deprivation

of her constitutional rights under 42 U.S.C. § 1983 and Ohio common law tort

claims against the City of Huber Heights, Ohio, and a number of its employees,

based on her arrest and detention after she and her daughter were the victims of a

home invasion and assault. Shoup's two remaining claims are a § 1983 claim of

excessive force and a common law claim of battery, both of which arise from the

circumstances of her arrest by Officer Brian M. Doyle ("Defendant" or "Officer

Doyle"), the only remaining Defendant. The Court has original jurisdiction over

Shoup's federal claim pursuant to 28 U.S.C. § 1343(a)(3), which allows for the

Court to exercise its supplemental jurisdiction over her state law claim pursuant to 28 U.S.C. § 1367(a).

Officer Doyle has filed a Motion for Summary Judgment (Doc. #27), arguing that he is entitled to qualified immunity on the § 1983 claim and statutory immunity under Ohio Rev. Code § 2744.03(A) on the battery claim. For the reasons set forth below, the motion is SUSTAINED.

## I.  RELEVANT FACTUAL BACKGROUND[1]

On the afternoon of October 22, 2010, Plaintiff left work and went to visit her daughter, Carrie Sports ("Sports"). Sports Dep. at 12, 25 (Doc. #28-5 at 4, 7). Sports lived in a townhouse apartment at 4575 Buford Blvd. in Huber Heights, Ohio, with her boyfriend Chad, her thirteen-year-old daughter and her one-year-old infant son. *Id.* at 13, 24 (Doc. #28-5 at 4, 7). After Shoup arrived, Sports went to the grocery store while her mother stayed with the children. *Id.* at 25-26 (Doc. #28-5 at 7-8). While Sports was out shopping, someone knocked on the door, asked for "Ryan," and tried to push the door open, but Shoup was able to shut and lock the door. *Id.* at 27 (Doc. #28-5 at 8).

After Sports returned home, a woman wearing only a bra knocked on the front door. Thinking that the woman "was in trouble," Sports opened the door. *Id.* at 27-28 (Doc. #28-5 at 8). The woman and two men began to attack Sports

---

[1] The facts of this case are, for the most part, undisputed. Where the parties differ in their versions of events, the Court notes the discrepancies and accepts the versions of Plaintiff and her daughter, Plaintiff being the party against whom the motion is directed.

and pull her outside. *Id.* at 30-31 (Doc. #28-5 at 9). Shoup was able to hide the children in the laundry room closet, after which the assailants pulled her outside as well. *Id.* One of the assailants grabbed a crutch from inside the house, hit Shoup with it, hit her in the face, and "stomp[ed] on her" after she fell down. *Id.* at 32-34 (Doc. #28-5 at 9-10). She appeared to have lost consciousness as a result, as she "was just laying there" after the attacks. *Id.* at 35-36 (Doc. #28-5 at 10).

The assailants continued to attack Sports outside the house for approximately five more minutes. *Id.* at 37-38 (Doc. #28-5 at 10-11). One of the male assailants had a gun. *Id.* at 41 (Doc. #28-5 at 11). The sound of police sirens caused the attackers to stop and begin to flee. *Id.* at 38 (Doc. #28-5 at 11). When police officers appeared, Sports pointed out two of the attackers. *Id.* at 41-42 (Doc. #28-5 at 11-12). Several officers pursued them, but Officer Doyle stayed with Sports. *Id.* The man with the gun was not apprehended until days later. *Id.*

Sports told Officer Doyle what had happened as they walked back to her apartment. *Id.* at 42-43 (Doc. #28-5 at 12). When they arrived, the door was locked, and Sports could hear her mother inside on the phone talking to 911. *Id.* at 44 (Doc. #28-5 at 12). When Shoup came out, she had a "bloody face and her lip was hanging off where it was split." *Id.* at 45 (Doc. #28-5 at 12). She was "[v]ery, very shaken," "hysterical," and was holding Sports' infant son. *Id.*

After Shoup emerged, a neighbor, Krista Semko, arrived and asked Sports if she wanted her to take the baby. *Id.* at 46/13. According to Sports, "we needed

3

to talk to the cops and tell them what was going on, but [Shoup] wouldn't let go" of the baby. *Id.* at 47 (Doc. #28-5 at 13). Shoup was "repeating [to] herself over and over, that the kids – the kids aren't going anywhere, the kids have to stay here," and was "slurring her words." *Id.* at 46 (Doc. #28-5 at 13). Sports attempted "to calm her down" and "get the baby," but her mother "had a death grip on him" and "wouldn't let him go." *Id.* Sports was afraid that Shoup would "squeeze him to death" and began to "pull[] at the baby" until the two "were playing tug-of-war" with the child. *Id.* at 47-49 (Doc. #28-5 at 13). Officer Doyle told Shoup "several times" to let go of the baby, but Shoup was unresponsive to his demands. Sports characterized her mother's condition as unable "to hear anything anybody was saying," unaware that Officer Doyle stood next to her, and "[o]ut of her mind upset." *Id*.

Officer Doyle then "grabbed [Shoup's] arm" and "spun her off the porch," at which time Sports was able to get the baby from her mother. *Id*. Shoup was "still hysterical," "difficult to understand," and kept her arms pulled up stiffly in front of her body. *Id.* at 53 (Doc. #28-5 at 14). She kept her arms in that position as Officer Doyle took her to the ground. *Id.* at 54 (Doc. #28-5 at 15). According to Sports, Officer Doyle "threw [Shoup] on the ground, put his knee in her back, [and] put her arms behind her." *Id.* at 53 (Doc. #28-5 at 14). She also described his action as having "flopped [Shoup] on the ground" and "put her facedown on the ground." *Id.* at 57 (Doc. #28-5 at 15). Sports heard Officer Doyle "holler at [Shoup] to put her arms behind her back." *Id.* at 58-59 (Doc. #28-5 at 16). Two

4

other officers approached, but Sports testified that no one assisted Officer Doyle.[2]
*Id.* She saw him place one knee on Shoup's back and another on the ground, but
did not actually see, or could not recall seeing, her mother being being handcuffed.
*Id.* at 63-65 (Doc. #28-5 at 17).  Approximately one minute passed between the
time that Officer Doyle grabbed Shoup's arm and he handcuffed her.  *Id.* at 70
(Doc. #28-5 at 19).

After handcuffing Shoup, Officer Doyle placed her in a police car, where she
remained for 30-45 minutes.  *Id.* at 72-73 (Doc. #28-5 at 19).  After Shoup was
released from the car, Sports' boyfriend drove them to the hospital, where Shoup
was admitted.  *Id.*  Sports testified that she was not aware of any injury to Shoup
that resulted from the interaction with Officer Doyle.  *Id.* at 76 (Doc. #28-5 at 20).

Krista Semko testified that she had been walking home when she saw a
group of people attacking Shoup and Sports.  Semko Dep. (Doc. #29 at 12-13).
Semko described where they lived as "a nasty neighborhood" where the police
were often called, and "a horrible neighborhood to live in."  *Id.* at 16.  She and her
husband called the police.  *Id.* at 17.  According to Semko, the "crowd" began to
flee as soon as sirens were heard, which was "normally how it went in that
neighborhood."  *Id.* at 18-19.

---

[2] Officer Doyle testified that Officer Waler assisted him in handcuffing Shoup.
Doyle Dep. at 179 (Doc. #28-1 at 46).  Sports stated that "nobody helped him."
Sports Dep. at 58, Doc. #28-5 at 58.  In its analysis, the Court accepts Sports'
version of events and considers Officer Doyle to have handcuffed Shoup
unassisted.  *See infra* Part IV.A.

5

Semko confirmed that she had offered to take the child from Shoup, who was "flipped out." *Id.* at 24-25. She believed that Shoup did not want her to take the baby "[b]ecause she didn't know who I was." *Id.* at 27. According to Semko, Shoup was "pinned on the ground and handcuffed." *Id.* at 28. She could not remember anything that Officer Doyle or Shoup said before the arrest, but remembered that Shoup was "struggling" while on the ground. *Id.* at 31-32. Semko did not remember another officer helping Officer Doyle, although she remembered that other officers were present. *Id.* In Semko's words, Officer Doyle was "rough" when taking Shoup to the ground, and Shoup was not "handled gently" before being handcuffed. *Id.* at 35. She also stated that Shoup "was slammed to the ground" by Officer Doyle, who was holding onto her as he put her onto the ground. *Id.* at 39.

Officer Doyle testified that on the night in question, he was dispatched to the area and was alone when he arrived. Doyle Dep. at 140 (Doc. #28-1 at 36). Officer Doyle described the neighborhood as "a high call area" where he had responded to many complaints. *Id.* at 158-59 (Doc. #28-1 at 41). He encountered Sports, who described the home invasion to him. *Id.* Sports told Officer Doyle that "she had been attacked and her mother had been assaulted and that her baby had been dropped."[3] *Id.* at 163 (Doc. #28-1 at 42).

_____

[3] As explained *infra* Part IV.A, Doyle stated that Sports had told him that the baby had been dropped, while Sports stated that she had told him that the baby had "rolled off of [Shoup's] arm and onto the floor" during the attack. Shoup Dep. at 77, Doc. #28-5 at 20. Although Sports did not outright deny that she had stated

6

Sports led him to her house.  Shoup emerged, holding the baby "very tightly."  *Id.* at 176 (Doc. #28-1 at 45).  Officer Doyle described Shoup as "very upset or hysterical or perhaps [in] a mental situation," as "she was not acting in a normal capacity, even for being a victim."  *Id.* at 177 (Doc. #28-1 at 46).  He was aware that Shoup was physically injured.  *Id.* at 197 (Doc. #28-1 at 51).  He was also concerned because Sports had told him that the baby had been dropped during the attack, and once Sports and Shoup began the "tug-of-war," he was "afraid the baby would get dropped again."  *Id.* at 177 (Doc. #28-1 at 46).  He instructed Shoup to give the baby to Sports and attempted "to divert her attention . . . [so] she could tell me what had happened."  *Id.*  Sports was then able to get the baby from Shoup.  However, Shoup "tried to take the baby back" and then "the child almost dropped."  *Id.*  At that point, Officer Doyle considered Shoup's behavior a threat to the child, and decided that he had to intervene to prevent any injury:

> At that point in time I took ahold of her bicep, to distract her towards me, to relocate her away from that volatile situation.  And she jerked her arm away.  I told her she needed to stop, let go of the baby so it doesn't get dropped again and come talk to me.  And I reached to grab for her arm again.  At that point she swung her elbow back in a striking fashion, hitting my arm.
>
> I attempted to grab her again and she started to spin away from me and twist her arm so I couldn't grab her.  At that point I told her that she was under arrest and that she needed to put her hands down to her sides and then behind her back.  She jerked away, out of my grasp.  So, I took, I grabbed her again.  And I pulled her to me.

that the baby had been dropped, the Court accepts her version for purposes of summary judgment.

> I led her to the ground with her torso area in the crick of my shoulder, [so] when we got onto the ground, where I could more easily control her, because at that point she was spinning and flinging her arms. Again, I was afraid for the safety of the children and the people around me. So, at that point, I straddled her, still ordering her to put her hands behind her back. And she continued to refuse, her arms were clutched up against her chest.
>
> And when I was finally able to get one arm behind her back, she continued to flail around with the other arm. And that's when Officer Waler approached and helped me get her in handcuffs. She was stood up and taken to a police car and sat in the back of the police car.

*Id.* at 177-179 (Doc. #28-1 at 46).

According to Officer Doyle, he "was not trying to hurt" Shoup when he took her down to the ground, but was "trying to just control" her by "using the amount of force necessary" to do so. *Id.* at 191-92 (Doc. #28-1 at 49). When he handcuffed her, he was "very concerned, because I [didn't] want to rip with all my might because, you know, that's going to hurt her and that's not the object. It's to gain control over her, not injure someone." *Id.*

Shoup has no memory of her interaction with Officer Doyle before she was put in the back of the police cruiser. Shoup Dep. at 93-94 (Doc. #28-3 at 24-25). The last thing that she remembers after the assailants dragged her daughter out of the house and assaulted her was telling the children to hide in the laundry room. *Id.* at 98, 101 (Doc. #28-3 at 26). She cannot trace any of the injuries she sustained that night to her arrest by Officer Doyle, as opposed to the violent attack from the assailants. *Id.* at 114 (Doc. #28-3 at 30). Before the night of the attack

8

and her arrest, she had never met Officer Doyle, and had no reason to believe that he harbored any ill will toward her. *Id.* at 106-07/28.

## II.   <u>PROCEDURAL BACKGROUND</u>

Shoup filed suit on October 21, 2011, in the Court of Common Pleas of Montgomery County, Ohio, alleging state law claims against Officer Doyle, police officers Shawn F. Waler ("Officer Waler") and Anthony W. Ashley ("Officer Ashley"), firefighter/paramedics Clifford B. Koss ("Koss") and James N. Kuntz ("Kuntz"), and the City of Huber Heights, Ohio ("City") (collectively, "Defendants"). Doc. #1 at 1. She filed an Amended Complaint on October 12, 2012, alleging violations of her federal constitutional rights under 42 U.S.C. § 1983. Doc. #2. As set forth in the Amended Complaint, Shoup alleged claims of assault and battery against Officer Doyle (First Claim); false arrest against Officer Doyle (Second Claim); false imprisonment against Officer Doyle (Third Claim); malicious prosecution against Officer Doyle (Fourth Claim); intentional infliction of emotional distress against Officers Doyle, Waler, and Ashley (Fifth Claim); intentional infliction of emotional distress against Koss and Kuntz (Sixth Claim); and a claim against the City, stating that it had a duty to indemnify Koss, Kuntz, and Officers Doyle, Waler, and Ashley (Seventh Claim). *Id.* Her remaining claims under 42 U.S.C. § 1983 were a claim for unlawful seizure against Officer Doyle (Eighth Claim); a claim of excessive force against Officer Doyle (Ninth Claim); a claim for malicious prosecution against Officer Doyle (Tenth Claim); a

9

claim of deliberate indifference to her serious medical needs against Doyle, Koss, and Kuntz (Eleventh Claim); a claim against the City for failure to train Officer Doyle (Twelfth Claim); and a claim against Doyle, Koss, and Kuntz for punitive damages (Thirteenth Claim). *Id.* Defendants removed the case to this Court on October 19, 2012. Doc. #1.

Defendants filed a Motion to Dismiss on November 10, 2012. Doc. #7. On September 24, 2013, the Court sustained in part and overruled in part Defendants' Motion to Dismiss, dismissing all claims against all Defendants, with the exception of the § 1983 claim of excessive force and the battery claim against Officer Doyle. Doc. #22. Accordingly, he is the only remaining Defendant in this action.

Officer Doyle filed a Motion for Summary Judgment on August 12, 2014. Doc. #27. Therein, he argues that he is entitled to qualified immunity on the excessive use of force claim because the undisputed facts demonstrate that he used an objectively reasonable amount of force when arresting Shoup. *Id.* at 7-11. Officer Doyle also argues that he is entitled to statutory immunity on the battery claim under Ohio Revised Code § 2744.03(A)(6), because the undisputed facts do not show that he acted in a malicious, wanton, or reckless manner, as required to abrogate immunity under the statute. *Id.* at 12-13.

Shoup filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment on September 5, 2014. Doc. #30. According to Shoup, because a reasonable jury could conclude that Officer Doyle used an unreasonable and unjustified amount of force when arresting her, based on the testimony that

she was "slammed" and "pinned" to the ground, her excessive force claim should not be dismissed.  *Id.* at 8.  She also contends that the force employed by Officer Doyle negated any privilege he held as a police officer to commit battery under Ohio law.  *Id.* at 9.

Officer Doyle filed a Reply Brief on September 16, 2014.  Doc. #31. Therein, he points out that the undisputed testimony of the witnesses, when considered in its entirety, does not demonstrate that he used an unreasonable amount of force during the arrest.  *Id.* at 1-7.  He also points out that Shoup's Response fails to address the issue of statutory immunity for her state law battery claim.  *Id.* at 8.

### III.   STANDARD OF REVIEW - MOTION FOR SUMMARY JUDGMENT

When a party moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine dispute of a material fact that is resolvable only

11

by a jury. *Celotex*, 477 U.S. at 324. The nonmovant must "cit[e] to particular parts of materials in the record" to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A). However, it is not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must "go beyond the pleadings" and present some type of evidentiary material that demonstrates the existence of a genuine dispute. *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson*, 477 U.S. at 250.

When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," as such are

12

"jury functions" that are inappropriate to employ at the summary judgment stage. *Anderson*, 477 U.S. at 255.

## IV.  ANALYSIS

The Court will first consider Shoup's federal claim under 42 U.S.C. § 1983 of excessive force, and will then turn to her battery claim, brought under the common law of Ohio.

### A.    The Fourth Amendment Excessive Force Claim under 42 U.S.C. § 1983 (Ninth Claim)

Shoup claims that Officer Doyle violated her Fourth Amendment right to be free from the excessive use of force when he arrested her on October 22, 2010. Such a claim arises under 42 U.S.C. § 1983, which requires the plaintiff to prove "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). Officer Doyle does not dispute that he acted under color of state law when made the arrest. Accordingly, the success of Shoup's claim depends on her ability to demonstrate that Officer Doyle employed excessive force when arresting her, thereby depriving her of her Fourth Amendment right to be free from the use of excessive force.

Officer Doyle has moved for summary judgment on the basis of qualified immunity, which is "an entitlement not to stand trial or face the other burdens of

13

litigation, conditioned on the resolution of the essentially legal question [of] whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (explaining the doctrine of qualified immunity, as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). The doctrine of qualified immunity will shield a state actor from § 1983 liability unless the plaintiff demonstrates "(1) that the official violated a . . . constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow*, 457 U.S. at 818). A court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223 (2009) (modifying its previous holding in *Saucier v. Katz*, 533 U.S. 194 (2001), that required a court to first consider whether the conduct violated a constitutional right before considering whether the right was "clearly established"). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir.2009)). "If the plaintiff fails to establish either element, the defendant is immune from suit." *T.S. v. Doe*, 742 F.3d 632 (6th Cir. 2014). "Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights."

14

*Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996). With the foregoing principles in mind, the Court will first determine whether, while viewing the facts in a light most favorable to Shoup and making all reasonable inferences in her favor, she has demonstrated that Officer Doyle used excessive force when arresting her, thereby violating her rights under the Fourth Amendment. If Shoup demonstrates this element, either based upon the undisputed facts in the record or by pointing to a genuine issue of material fact that would demonstrate such a violation at trial, the Court will then determine whether the right was "clearly established" at the time of her arrest. If she demonstrates both elements, the Court will deny summary judgment to Officer Doyle. Conversely, Shoup's failure to demonstrate one or both of the elements will signal her inability to resist the defense of qualified immunity, and will, therefore, result in a grant of summary judgment in favor of Officer Doyle.

An excessive force claim "can be raised under the Fourth, Eighth, and Fourteenth Amendments," depending upon "the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). With regards to "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person," the Fourth Amendment applies. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that

15

the force used in effecting the seizure was objectively unreasonable." *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011) (citing *Graham*, 490 U.S. at 394–95). Here, it is undisputed that a seizure occurred when Officer Doyle arrested Shoup and placed her in the back of his cruiser. Shoup must, therefore, demonstrate that it was objectively unreasonable for Officer Doyle to employ the amount of force that he used during the seizure.

The objective reasonableness standard in an excessive force claim "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). The standard "depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)); *see also Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. When analyzing an excessive force claim, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

16

evade arrest by flight." *Id.* at 396. The totality of the circumstances must demonstrate that the officers applied an amount of force that was objectively reasonable, "without regard to their underlying intent or motivation." *Id.* at 397.

Consideration of the *Graham* factors leads the Court to conclude that Officer Doyle used an objectively reasonable amount of force when arresting Shoup. For the following reasons, this conclusion is inevitable when all of the facts and circumstances surrounding the arrest are considered, viewed from the perspective of a reasonable officer on the scene, and construing the evidence in Shoup's favor. First, Officer Doyle arrived during the immediate aftermath of a violent assault in a high-crime neighborhood to encounter one of the two victims, who pointed out two of the three fleeing assailants to other officers. The other assailant had a gun, and they were all still at large when Officer Doyle encountered Sports. These "tense, uncertain, and rapidly evolving" circumstances formed the backdrop for the interaction between Shoup and Officer Doyle. *Graham*, 490 U.S. at 396-97.

Second, on the way to her house, Sports informed him that her baby had been "rolled off of her [mother's] arm onto the floor" during the attack.[4] Shoup

---

[4] Sports was told that Officer Doyle's report stated that she had said that the baby had been dropped during the assault. Shoup Dep. at 77 (Doc. #28-5 at 20). When asked if her statement had "been an exaggeration or just trying to explain what had happened?" she replied: "Probably trying to explain what had happened," and, "[i]f anything, I wasn't exaggerating at all." *Id.* Thus, although she did not deny telling Officer Doyle that the baby had been dropped, she did not describe her mother as having dropped the baby during the deposition, stating that "she put him down, but it was a sit him down . . . we were getting hit and she put him off to the side, rolled him off of her arm onto the floor[.]" *Id.* Although Officer Doyle testified that Sports had told him that the baby had been dropped, the Court will

Dep. at 77 (Doc. #28-5 at 20). When Shoup opened the door with the baby "in a death grip", unable to communicate, highly agitated, and refusing to give him to her daughter until a "tug-of-war" over the child developed, a reasonable officer would have been highly concerned with the baby's safety.

Third, when Shoup did not respond to multiple demands to let the baby go and appeared, in fact, unable to understand anything being said to her or even to be aware of the officer's presence, a reasonable officer would have been justified in making the decision to seize her by grabbing her arm. Officer Doyle did this, which allowed Sports to get the baby.

Fourth, when Shoup kept her arms stiffly held in front of her, she was resisting Officer Doyle's attempts to control her. Thus, a reasonable officer would have been justified in making the "split-second" decision to take her to the ground in order to get her hands into a position where they could be handcuffed. *Graham*, 490 U.S. at 396.

Fifth, in light of the facts and circumstances, the specific amount of force used take Shoup to the ground and handcuff her was not objectively unreasonable. The gravamen of her excessive force claim is that she was "slammed to the ground" when Officer Doyle took her down to handcuff her, and that he placed a knee on her back while doing so. Doc. #30 at 8. The depositions are replete with

accept Sports' version for purposes of summary judgment. Thus, a reasonable officer on the scene would have arrived at her door after being told that the baby had been "rolled" off of her mother's arm and onto the floor during the attack. The Court believes that either version would have caused a reasonable officer to be concerned for the baby's safety.

descriptions of how Officer Doyle took Shoup to the ground.  According to Sports, he "threw her on the ground," "flopped her on the ground," and "put her facedown on the ground."  Sports Dep. at 53, 57 (Doc. #28-5 at 14,15).  Semko stated that Shoup "was slammed to the ground," "pinned on the ground," subject to "rough handling," and not "handled gently."  Semko Dep. at 35 (Doc. #29 at 35).  The Court cannot conclude, however, that the quantum of force that these descriptions suggest was unreasonable, even when accepting them as true, construing them favorably towards the Plaintiff, and even when disregarding Officer Doyle's description of the force he used.  Sports described Shoup as maintaining her arms stiffly in front of herself immediately before Officer Doyle took her down to the ground.  Sports Dep. at 52 (Doc. #28-5 at 14).  The Court infers that Shoup's action made it impossible for Officer Doyle to control her or handcuff her without taking her down to the ground.[5]  Semko also described Shoup as "struggling" after she was taken down.  Semko Dep. at 32 (Doc. #29 at 32).  It was not unreasonable, therefore, for Officer Doyle to attempt to immobilize her with his knee in order to handcuff her.  The "takedown" and handcuffing took less than one minute, and there is no evidence that either of these actions caused Shoup any injury.  Sports Dep. at 76 (Doc. #28-5 at 20).  Shoup admits that none of the

_____

[5] Although the Court must make all reasonable inferences in Shoup's favor on summary judgment, this is the only inference to be made.  Shoup has not suggested that the act of stiffly holding her arms in front of herself while Officer Doyle attempted to handcuff her should be inferred to have done anything other than make the act of arresting her more difficult, or otherwise disputed the effect it had on Officer Doyle's attempts at handcuffing her.

19

injuries that she sustained that night were traceable to her arrest, as opposed to the violent attack from the assailants.  Shoup Dep. at 114 (Doc. #28-3 at 30).

Further consideration of these facts in light of other *Graham* factors does not lead the Court to conclude that the force applied was excessive.  At first glance, the "severity of the crime" factor appears minimal, as Shoup was arrested for "disorderly conduct."  However, the nature of disorderly conduct implies that some amount of force may be necessary to effect an arrest of the suspect.  The more relevant *Graham* factors here, however, are "whether the suspect poses an immediate threat to the safety of the officers or others," and whether Shoup was "actively resisting arrest[.]"  *Id.* at 396.  As discussed, there was an entirely reasonable and logical fear of harm to the baby.  This conclusion is based in no part on any evidence that Shoup intended to harm the baby.  Rather, her traumatized, dissociated state could have led to that unfortunate consequence through no fault or intention on her part.  Officer Doyle was completely justified in making the "split-second" call in "tense" and "uncertain" circumstances to prevent that from happening.  *Graham*, 490 U.S. at 396-97.  The Court views her inability to respond to or understand Officer Doyle as directly caused by the trauma she had experienced.  Unfortunately, the effect of that trauma also manifested as sufficient resistance to justify the force he employed to arrest her.  While it is regrettable that Officer Doyle had to arrest Shoup, the undisputed evidence demonstrates that he employed a reasonable amount of force to do so.

20

Citing to Officer Doyle's deposition, Shoup argues that she "had given up the child" to her daughter by the time he grabbed her with both arms and took her down. Doc. #30 at 8. These observations do not demonstrate that the force that Officer Doyle used was unreasonable under the totality of the circumstances. First, the Court must allow for the fact that he had to make a split-second decision to seize Shoup after she had been actively struggling with her daughter to maintain control of the child. *Graham*, 490 U.S. at 396-97. Due to Shoup's highly upset, hysterical, and non-communicative state, deciding to simply let her go would have risked having her try to grab the baby back from Sports. Thus, second guessing whether Officer Doyle should have simply let Shoup go after her daughter obtained the baby from her is an invitation to engage in "20/20 hindsight" rather than the "perspective of a reasonable officer on the scene" that the analysis requires. *Binay* 601 F.3d at 647; *Graham*, 490 U.S. at 396.

Shoup also argues that she posed no threat to Officer Doyle, and cites *Harrison v. City of Dickson, Tenn.*, 2013 WL 1482950, No. 3:11-cv-1044 (M.D. Tenn. Apr. 11, 2013). In *Harrison*, the court denied summary judgment on the basis of qualified immunity to an officer who struck an injured, immobilized motorcyclist in the face after he refused to hand over a closed pocketknife. The *Harrison* court found the defendant's argument that he had the "authority and responsibility to secure the scene of the accident" insufficient to justify knocking "an injured and non-threatening motorcycle accident victim" in the face with enough force to dislodge the victim's tooth, knocking him and a paramedic to the

21

ground. *Harrison* is distinguishable for a number of reasons. While it is true that no reasonable officer would have felt personally threatened by Shoup's behavior or that of the injured, immobilized motorcyclist in *Harrison*, the salient perception of a threat in this case was to the safety of the baby, not to the police officer. In *Harrison*, there was no reasonable perception of a threat to anyone; the motorcyclist was being held from behind by a paramedic "in a c-spine . . . to prevent movement and further injury" when the officer struck him in the face. In contrast, Shoup was fully mobile, squeezing the baby so tightly that Sports was concerned she would "squeeze him to death," and refusing to hand him to anyone.

Furthermore, the force that the officer used in *Harrison* knocked out the victim's tooth and resulted in contusions. Here, as discussed, there is no evidence that Officer Doyle's actions caused any injury to Shoup or exacerbated the injuries that she suffered at the hands of the assailants. Sports Dep. at 76 (Doc. #28-5 at 20); Shoup Dep. at 114 (Doc. #28-3 at 30).

Based on the foregoing, the undisputed evidence before the Court does not demonstrate that Officer Doyle used an excessive amount of force when arresting Shoup. Shoup has, therefore, failed to overcome the first prong of Officer Doyle's qualified immunity defense. Accordingly, Officer Doyle's Motion for Summary Judgment is sustained with regards to Shoup's claim of excessive force under 42 U.S.C. § 1983 (Ninth Claim), and the Court grants him summary judgment on the basis of qualified immunity on said claim.

22

### B.    The State Law Battery Claim (First Claim)

Shoup also alleges that the force Officer Doyle applied when arresting her constituted battery under Ohio common law.  Doc. #2.  Officer Doyle argues that he is entitled to summary judgment on this claim because the undisputed evidence shows that he did not act maliciously, wantonly, or recklessly, as required for her claim to be excepted from the statutory immunity granted by Ohio Rev. Code § 2744.03.  Doc. #12.  Shoup responds by arguing that a reasonable jury could conclude that Officer Doyle used excessive force, which would negate any privilege he held to commit battery while making the arrest.  Doc. #30 at 9.  In his Reply Brief, Officer Doyle argues that Shoup fails to even address the issue of statutory immunity under Ohio Rev. Code § 2744.03.  Doc. #31 at 8.

Under Ohio Rev. Code § 2744.03(A)(6), a municipal employee sued for damages in a civil action "is immune from liability" unless one of three exceptions applies.  An employee whose "acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities" is not immune.  *Id.* § 2744.03(A)(6)(a).  Immunity does not apply if the employee acted "with malicious purpose, in bad faith, or in a wanton or reckless manner."  *Id.* § 2744.03(A)(6)(b).  Nor does immunity apply if "liability is expressly imposed upon the employee" by another section of the Ohio Revised Code.  Here, Shoup's battery claim does not allege that Officer Doyle acted outside the scope of his employment, or that another section of the Ohio Revised Code expressly imposes liability on him for his actions.  Nor did she allege that Officer Doyle committed

23

battery in "bad faith." Her allegations state that the act of battery was "intentional and malicious," and that all of Officer Doyle's acts "were wanton and reckless and proximately resulted in injury" to her. Am. Compl. ¶¶ 50, 54; Doc. #2 at 7-8. Thus, only the "malicious purpose" or "wanton or reckless manner" exceptions to immunity under Ohio Rev. Code § 2744.03(A)(6)(b) might apply.

For purposes of Ohio's immunity statute, malicious purpose "can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 737 N.E.2d 563, 567 (Ohio Ct. App. 2000) (citing *Jackson v. Butler Cnty. Bd. Cnty. Comm'rs*, 602 N.E.2d 363, 366-67 (Ohio Ct. App. 1991)). Based on the undisputed facts before the Court, Officer Doyle did not act with malicious purpose. First, the definition of "malicious purpose" requires action through "conduct that is unlawful or unjustified." There is no indication that Officer Doyle has been subjected to criminal charges for arresting Shoup, and Court has concluded that the arrest was not an unlawful or unjustified use of force under the Fourth Amendment. Being neither unlawful nor unjustified, it cannot form an actionable basis for inquiring into Officer Doyle's intent when arresting Shoup. Second, the undisputed facts demonstrate that Officer Doyle did not possess a "willful and intentional design" to injure Shoup. Sports testified that she had no reason to believe that he harbored any ill will or was "out to get" her mother. Sports Dep. at 80-81 (Doc. #28-5 at 21). Shoup herself has no memory of the encounter. Shoup Dep. at 98 (Doc. #28-3 at 26). Officer Doyle testified that he

24

"was not trying to hurt" Shoup, only "trying to just control" her by "using the amount of force necessary" to do so.  Doyle Dep. at 191 (Doc. #28-1 at 49). Shoup has not disputed this testimony (with anything other than her claim that he used excessive force), nor has she pointed to anything in the record that might create a genuine issue of material fact, regarding the non-malicious nature of Officer Doyle's intent.

The undisputed facts also demonstrate that Officer Doyle did not act wantonly.  "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result."  *Anderson v. Massilon*, 983 N.E.2d 266, 273 (Ohio 2012) (citing *Hawkins v. Ivy*, 363 N.E.2d 367, 369 (Ohio 1992)).  Because Shoup was visibly injured when Officer Doyle arrested her, there was at least some probability that harm would result from using force to effect the arrest.  Nevertheless, as stated, Shoup has not pointed to any evidence in the record that contradicts his testimony that he attempted to arrest her without hurting her.  He did not, therefore, exercise a lack of care that amounted to wanton misconduct.

Finally, the undisputed facts demonstrate that Officer Doyle did not act recklessly.  "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct."  *Id.* (citing *Thompson v. McNeill*, 559 N.E.2d 705, 707-08 (Ohio 1990) (abrogated by

25

*Anderson*, 983 N.E.2d at 273)).[6]  Rather than demonstrate reckless conduct, Officer Doyle's testimony demonstrates that he was aware of the risk that he could have injured Shoup while arresting her and took preventative steps to prevent that from happening.  Furthermore, as discussed, neither Shoup nor Sports were able to identify any injury to Shoup that resulted from the arrest or the amount of force that Officer Doyle used.  There is, therefore, no support for Shoup's allegation of recklessness on his part.

Because the undisputed facts demonstrate that Officer Doyle did not act "with malicious purpose . . . or in a wanton or reckless manner," when arresting Shoup, the exception to statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(b) does not apply.  The immunity for a municipal employee's liability in a civil action under Ohio Rev. Code § 2744.03(A)(6) therefore applies to Shoup's battery claim.  Accordingly, the Court sustains Officer Doyle's Motion for Summary Judgment with regards to the common law battery claim (First Claim), and grants him summary judgment on said claim on the basis of statutory immunity under Ohio Rev. Code § 2744.03(A)(6).

---

[6] In *Anderson*, the Ohio Supreme Court held that the terms willful, wanton, and reckless each "describe different and distinct degrees of care and are not interchangeable" when construing Ohio Rev. Code § 2744.03(A)(6)(b).  983 N.E.2d at 273.  It therefore chose to "disavow the dicta contained in *Thompson* . . . that 'willfulness,' 'wantonness,' and 'recklessness' are equivalent standards," but still cited *Thompson* for the definition of "reckless conduct" that it adopted.  *Id.* (citing *Thompson*, 559 N.E.2d at 707-08).

## V.    **CONCLUSION**

It is hard not to feel a great deal of sympathy for the Plaintiff, given all that she underwent from the time her daughter's home was invaded by strangers. However, no matter how understandable her actions were under the circumstances, there is simply no genuine issue of material fact as to whether this Defendant, under the circumstances presented him, acted contrary to law and/or the Constitution.

To summarize, Officer Doyle is entitled to qualified immunity on Shoup's § 1983 claim because Shoup has failed to satisfy her burden of showing, either based on the undisputed facts in the record or by pointing to a genuine issue of material fact that would demonstrate such a violation at trial, that he violated her Fourth Amendment right to be free from excessive force during arrest.  Officer Doyle is also entitled to statutory immunity under Ohio Rev. Code § 2744.03(A)(6) for Shoup's Ohio common law claim of battery because the undisputed facts demonstrate that no exception to statutory immunity applies to her claim. Accordingly, the Court SUSTAINS Defendant's Motion for Summary Judgment (Doc. #27).

Judgment will be entered in favor of Defendant and against Plaintiff on the two remaining claims in this action, the common law battery claim (First Claim) and the claim of excessive force arising under 42 U.S.C. § 1983 (Ninth Claim) in the Amended Complaint (Doc. #2).

27

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: December 22, 2014

WALTER H. RICE
UNITED STATES DISTRICT JUDGE